**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ASSOCIATION OF FLIGHT ATTENDANTS-** | ) | |
| **CWA ("AFA"), AND MARIANNE BICKSLER** | ) | |
| | ) | |
| | ) | **Case: 1:08-cv-02009 (RWR)** |
| **PLAINTIFFS** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DELTA AIR LINES, INC.** | ) | |
| | ) | |
| **DEFENDANT** | ) | |
| | ) | |

**<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and as more fully

described in the accompanying Memorandum In Support of Motion to Dismiss the Amended

Complaint, Defendant Delta Air Lines, Inc. ("Delta") moves to dismiss the Amended Complaint

of the Association of Flight Attendants - CWA ("AFA") and Marianne Bicksler ("Bicksler") for

lack of subject matter jurisdiction.

Delta moves to dismiss the Amended Complaint because the Amended Complaint

presents claims that are beyond the subject matter jurisdiction of this court.  Federal courts have

no subject matter jurisdiction to address the representation consequences of airline mergers and

similar transactions under the Railway Labor Act ("RLA").  Representation issues and related

issues that are "inextricably intertwined" with the representational status of unions are within the

exclusive jurisdiction of the NMB under Section 2, Ninth of the RLA.

WHEREFORE, Delta respectfully requests that the Court dismiss the Plaintiffs'

Amended Complaint for lack of subject matter jurisdiction.


December 15, 2008                          Respectfully submitted,

                                          By:_____/s/ John J. Gallagher_____
                                               John J. Gallagher (D.C. Bar # 191502)
                                               Neal D. Mollen (D.C. Bar # 413842)
                                               Margaret H. Spurlin (D.C. Bar # 296970)
                                               PAUL, HASTINGS, JANOFSKY & WALKER LLP
                                               875 15th St., N.W.
                                               Washington, D.C.  20005
                                               (202) 551-1700

                                               Attorneys for Delta Air Lines, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASSOCIATION OF FLIGHT ATTENDANTS-** )<br>**CWA ("AFA"), AND MARIANNE BICKSLER** )<br> )<br> )<br>**PLAINTIFFS** )<br> )<br>**v.** )<br> )<br>**DELTA AIR LINES, INC.** )<br> )<br>**DEFENDANT** ) | **Case: 1:08-cv-02009 (RWR)** |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

I.    **INTRODUCTION**

On October 29, 2008, Delta Air Lines, Inc. acquired Northwest Airlines, Inc.  (Amended

Complaint ¶ 13).  The Association of Flight Attendants ("AFA") was the certified union

representative of the approximately 7,500 flight attendants employed by pre-merger Northwest

(Amended Complaint ¶¶ 4, 11); the approximately 13,500 pre-merger Delta flight attendants are

non-union.[1]  (Amended Complaint ¶ 11).  Labor relations in the airline industry are governed by

the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, which provides that "[t]he *majority* of

any craft or class of employees shall have the right to determine who shall be the representative

of the craft or class for the purposes of" collective bargaining.  Section 2, Fourth, 45 U.S.C.

§ 152, Fourth (emphasis added).  Section 2, Ninth, of the RLA, 45 U.S.C. § 152, Ninth, vests

exclusive jurisdiction in a federal agency, the National Mediation Board ("NMB" or "Board"), to

---

[1]  The pre-merger Delta flight attendants have voted against representation by AFA twice in
recent years in elections conducted by the NMB.  29 NMB 190 (2002); 35 NMB 180 (May 29,
2008).

determine who, if anyone, the majority of employees in a craft or class wishes to have as the representative of that craft or class.

Under these circumstances, AFA's Amended Complaint presents a classic "representation dispute" within the mandatory and exclusive jurisdiction of the NMB.  Although the NMB has procedures designed to address representation issues arising in connection with airline mergers, AFA has not filed to invoke the services of the NMB to determine the representation choice of a majority of Delta's post-merger flight attendants, and Delta is precluded by D.C. Circuit authority from doing so itself.[2]  (Amended Complaint ¶ 21).  Instead, AFA has instituted this litigation for purposes of delay and to circumvent the NMB's exclusive jurisdiction over representation issues under the RLA.  This is not conjecture; the individually named Plaintiff, Marianne Bicksler, admitted as much to the news media:  "I hate to call [the lawsuit] a stall tactic, but it's basically to get Delta to hold back the process.  They are trying to push [seniority integration] through and *not honor the Northwest flight attendants' representational rights*."  Exhibit 3.  (second brackets in original; emphasis added).

## II.   SUMMARY OF ARGUMENT

### A.   This Court Has No Subject Matter Jurisdiction Over Union Representation Issues In An Airline Merger.

Federal courts have no subject matter jurisdiction to address the representation consequences of airline mergers and similar transactions under the Railway Labor Act.

---

[2]  *Ry. Labor Exec. Ass'n v. NMB*, 29 F.3d 655 (D.C. Cir.) (*en banc*), *amended*, 38 F.3d 1224 (D.C. Cir. 1994), *cert. denied*, 514 U.S. 1032 (1995).  AFA could easily resolve any doubt about its representative status if it chose to do so.  Indeed, five of the eight unions involved in the Delta-Northwest merger have elected to participate in NMB proceedings initiated by the Air Line Pilots Association to secure a single carrier determination and an election or certification.  AFA, however, has refused to participate, and has asserted that the NMB has no authority to make any determination that would affect AFA without AFA's voluntary participation.  *See infra* at III.C.; Exhibit 2.

Representation claims by unions, and related issues that are "inextricably intertwined with" the representational status of unions,[3] are within the exclusive jurisdiction of the NMB under Section 2, Ninth, of the RLA. *Switchmen's Union v. NMB*, 320 U.S. 297 (1943); *AFA v. Delta Air Lines, Inc.*, 879 F.2d 906 (D.C. Cir. 1989); *AFA v. USAir, Inc.*, 24 F.3d 1432, 1440-41 (D.C. Cir. 1994); *May v. Shuttle, Inc.*, 129 F.3d 165 (D.C. Cir. 1997).  Neither artful pleading nor invocation of other statutes will lead to different results on this jurisdictional issue. *Id.*; *see also Bhd. of Ry. and S.S. Clerks v. United Air Lines, Inc.,* 325 F.2d 576, 579 (6th Cir. 1963).  AFA's Amended Complaint attempts to draw the Court into just this sort of representational dispute. AFA's Amended Complaint alleges that, since the acquisition, "Northwest continues to operate as a separate carrier" (¶ 6), that "no indicia of a single carrier exist for the craft or class of flight attendants" (¶¶ 21, 35), and that there has yet to be an NMB finding of single carrier status (¶¶ 25, 29, 30, 35, 37).

To grant AFA the relief it seeks, the Court would first have to determine (a) whether the Delta-Northwest combination created a "single transportation system" for representation purposes under the RLA; and (b) what AFA's post-merger representation rights are and will be with respect to some or all of the combined group of Delta and Northwest flight attendants. These are questions that the Court has no jurisdiction to resolve; that jurisdiction lies exclusively with the NMB.  It is Delta's position that the Delta-Northwest merger has created a single

---

[3]  Courts have no jurisdiction over claims, including non-RLA claims, which "are inextricably intertwined with a representation dispute, which is within the exclusive jurisdiction of the National Mediation Board." *IFFA v. Cooper*, 141 F.3d 900, 903 (8th Cir. 1998).  "The [RLA] commits disputes involving a determination of who is to represent airline employees in collective bargaining to the exclusive jurisdiction of the National Mediation Board.  A court may not entertain an action involving such a dispute even if it arises in the context of otherwise justiciable claims." *IBT v. Texas Int'l Airlines*, 717 F.2d 157, 161 (5th Cir. 1983), citing *Switchmen's Union*, 320 U.S. 297, and *Bhd. of Locomotive Firemen v. Seaboard Coast Line R.R. Co.*, 413 F.2d 19 (5th Cir.), *cert. denied*, 396 U.S. 963 (1969).

transportation system for representation purposes under the RLA and that, under those circumstances, AFA cannot lawfully claim prospective representation rights over only a portion of the flight attendants employed by the post-merger system.  The NMB has long held that the RLA permits representative certification only for unions chosen by the *majority* of employees in a craft or class.[4]  45 U.S.C. 152, Fourth.

AFA has recourse to the NMB to determine the effect of the merger transaction on AFA's representation status.  AFA's failure to pursue that avenue speaks to the purposes of this litigation — as revealed by the comments of Plaintiff Bicksler (quoted above).  Because these threshold questions regarding AFA's representative status are "inextricably intertwined" with the relief sought, and because any determination by this Court would necessarily intrude into the exclusive authority of the National Mediation Board to resolve those questions of representation under the RLA, this Court has no subject matter jurisdiction over AFA's Amended Complaint.

Indeed, AFA has previously litigated this very jurisdictional issue with Delta in the context of an earlier merger.  879 F.2d 906.  There, the court concluded that AFA's claims for prospective relief were "nonjusticiable because the relief sought [was], in effect, a certification within the meaning of § 2 Ninth; and as such, [was] within the exclusive competence of the NMB."  879 F.2d at 912.[5]  *See also May v. Shuttle, Inc.*, 129 F.3d at 176 ("The danger that would

---

[4]  An NMB finding of a single transportation system requires that there be a single representative, chosen by a majority, for each "craft or class" within the system.  *See Seaboard System Railroad-Clinchfield Line*, 11 NMB 217, 224 (1984) (citing the First Annual Report of the National Mediation Board (1935)).  Indeed, in the seminal decision *Switchmen's Union v. NMB*, 320 U.S. 297 (1943), the NMB determined that "Railway Labor Act vests the Board with **no discretion** to split a single carrier . . ." 320 U.S. at 309 (Reed, dissenting) (quoting NMB decision) (emphasis added).

[5]  The D.C. Circuit did allow AFA to pursue arbitration of a claim solely for damages for breach of contract, finding that such a remedy did not intrude upon the NMB's exclusive jurisdiction to address AFA's representation rights.  879 F.2d at 917.

- 4 -

arise if the Court were to accept plaintiffs' proposition that their . . . Shuttle . . . agreement remained in existence . . . is that the Court would, in effect, recognize the union as [their] bargaining agent.").[6]  The present Amended Complaint suffers from the same defect noted in these earlier cases.

It makes no difference to the outcome that AFA has joined an individual flight attendant as a plaintiff or that AFA has raised claims under a separate statute related to seniority integration (the so-called McCaskill-Bond seniority integration statute) in addition to claims under the Railway Labor Act.  The problem with the Amended Complaint lies not with the name of the Plaintiff or the statutes invoked.  The problem lies in the nature of the relief sought:  a declaratory judgment that Delta's efforts to initiate seniority integration procedures "constitute unlawful interference *under the RLA with the rights of those employees to choose their representative and to organize and bargain collectively through that representative*" and "are premature" prior to a single carrier determination by the NMB.  Such relief cannot be granted by this Court without an implicit determination that Northwest and Delta remain separate carriers for representation purposes and/or that AFA continues to have representative status under the RLA — a determination that is beyond the jurisdiction of this Court.  As the Sixth Circuit held in

---

[6]  The other courts of appeals have consistently rejected union attempts to involve the judiciary in post-merger representation issues, no matter how creative the theory.  *ALEA v. Republic Airlines, Inc.*, 798 F.2d 967, 968 (7th Cir. 1986); *Bhd. of Ry. and S.S. Clerks v. United Air Lines, Inc.*, 325 F.2d 576; *Division No. 14, Order of R.R. Telegraphers v. Leighty*, 298 F.2d 17, 20 (4th Cir. 1962); *IAM v. Northeast Airlines, Inc.*, 536 F.2d 975, 977 (1st Cir. 1976) (dismissing union claims relating to seniority integration and contract issues arising from the merger of Northeast into Delta; "the duty to bargain imposed by the [RLA] is a duty to bargain with the chosen representative of the majority of a craft or class. . . .  At the very least, the merger created real doubts about whether plaintiffs represent the majority of any Delta craft . . . ***and where there is such doubt, federal courts leave resolution of the dispute to the [NMB].***") (emphasis added); *IUFA v. Pan Am. World Airways, Inc.*, 836 F.2d 130 (2d Cir. 1988); *FEIA v. Pan Am. World Airways, Inc.*, 896 F.2d 672 (2d Cir. 1990).

*Bhd. of Ry. and S.S. Clerks v. United Air Lines, Inc.*, the courts are not bound by the form of the complaint, but must "look[] through form to substance" to determine whether the matter presents representation issues that are beyond the jurisdiction of the court.  325 F.2d 576.

> **B.**     **This Court Has No Subject Matter Jurisdiction Over Claims Arising Under The McCaskill-Bond Statute.**

Alternatively, even if, *arguendo*, the Court were to find that the seniority integration issues do not present a representation dispute under the RLA, the language and legislative history of the McCaskill-Bond statute, and the precedent under the Allegheny-Mohawk Labor Protective Provisions imposed by that statute, make clear that (a) the McCaskill-Bond statute does not create a private right of action; (b) all issues relating to the seniority integration process are consigned to a single arbitration process and beyond the jurisdiction of the courts; and (c) that piecemeal litigation of procedural issues under those provisions is anathema to their purpose to provide for the *prompt*, fair, and equitable resolution of seniority issues arising in an airline merger.  For this reason, the Civil Aeronautics Board ("CAB") and the courts repeatedly rejected efforts to secure judicial intervention under the provisions that are incorporated by reference into McCaskill-Bond, which the CAB described as "'a system of self-government' between merging carriers and affected employees (or their representatives)" and that the arbitration requirement in the provisions is intended to be 'the means of solving the unforeseeable [dispute] …' without Board intervention."  *National Airlines Acquisition*, 97 CAB 570, 573 (1982); *see also Tiger-Seaboard Acquisition*, 101 CAB 659 (1983).

## III.     BACKGROUND FACTS

The following background facts are either alleged in the Amended Complaint, or are verified by the Declaration of Michael H. Campbell, Delta's Executive Vice President for Human Resources and Labor Relations (attached as Exhibit 1).  Mr. Campbell also authenticates

the Exhibits submitted herewith.  Delta provides these facts solely for the information of the

Court as background to the jurisdictional issues presented by the Amended Complaint.  Delta

believes that these facts are undisputed, but submits that its motion is based entirely on questions

of law.[7]

### A.     Delta's Acquisition Of Northwest Airlines.

On October 29, 2008, Delta Air Lines, Inc. acquired all ownership interests in Northwest

Airlines Corporation, including its wholly owned subsidiary, Northwest Airlines, Inc.  (Amended

Complaint ¶¶ 6, 13.)  Pursuant to plans publicly announced while the transaction was pending

required government review, on the date the transaction was consummated, Delta integrated the

management of the two carriers, including scheduling, pricing, marketing and labor relations.

Also on the day after the transaction closed, pursuant to an agreement with the Air Line Pilots

Association, International ("ALPA," the union that represented the pilots at pre-merger

Northwest as well as Delta), Delta implemented a combined collective bargaining agreement

applicable to all pilots of the merged airline.  The pilots have undertaken seniority integration

proceedings that have resulted in a final decision by a neutral arbitration panel.

### B.     Flight Attendant Union Representation At The Pre-Merger Carriers.

The approximately 13,500 flight attendants employed by Delta pre-merger were not

represented by a union; they had twice rejected efforts by AFA to become their representative,

first in 2002, 29 NMB 190 (2002), and again just months prior to the merger.  35 NMB 180

(May 29, 2008).  The approximately 7,500 flight attendants employed by Northwest pre-merger

---

[7]  *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 363 (D.C. Cir. 1982) (court can consider
materials outside of the complaint in deciding whether it has subject matter jurisdiction motion
under Fed. R. Civ. P. 12(b)(1)).

were represented by Plaintiff AFA pursuant to a certification issued in 2006 by the NMB.  33

NMB 289 (July 7, 2006).

       **C.**       **Single Carrier Proceedings Before The National Mediation Board.**

       On November 4, 2008, ALPA applied to the NMB for a certification designating it as

representative of all pilots employed by post-merger Delta.  Exhibit 4.  Under procedures

published at Section 19 of the NMB Representation Manual (available at

http://www.nmb.gov/representation/representation-manual.pdf ) (last visited 12/15/08), upon

receipt of such a representation application in the context of a merger, the NMB first proceeds to

determine whether the two pre-merger carriers have become a "single transportation system" for

representation purposes under the RLA.  Once the Board makes such a determination, the Board

has procedures for determining the representation consequences of the merger among the various

work groups (or, in RLA terminology, "crafts or classes") of employees at the combining

carriers.

       In this instance, after receiving ALPA's application, the NMB invited all unions at

Northwest and Delta to state their positions on the single transportation system question.

Exhibit 5.  In response, two other pre-merger unions also sought NMB certification as post-

merger representatives, the Professional Airline Flight Controllers Association ("PAFCA"), the

incumbent union representative of the Dispatchers employed by pre-merger Delta, and the

Northwest Airlines Meteorologists Association ("NAMA"), the incumbent representative of the

meteorologists employed by pre-merger Northwest.  Exhibits 6, 7.  The NMB joined each of

these applications in the same proceeding, NMB Case CR-6950.  Exhibits 8, 9.

       There were a total of eight unions at the pre-merger carriers.  Five of those unions have

taken the position in the ALPA-initiated proceeding before the NMB that the acquisition has

resulted in a single transportation system for representation purposes under the RLA.

Exhibits 10-14.[8]  The other three unions, including Plaintiff AFA, have taken the position that

the NMB cannot determine the issue as to their craft or class absent an application specific to

that craft or class, *i.e.*, that the Board was powerless to decide any question as to the employees

in their craft or class until the unions wish to have the issue decided.  Exhibits 2, 15, 16.

       D.      **Seniority Integration Procedures.**

Prior to airline deregulation, issues relating to the integration of seniority lists in airline

mergers generally were resolved in accordance with Sections 3 and 13 of the so-called

"Allegheny-Mohawk" Labor Protective Provisions ("LPPs") imposed by the CAB as a condition

to its approval of a merger.[9]  These provisions required that seniority integration be addressed in

a "fair and equitable" manner (Section 3), with prompt resort to arbitration before a neutral labor

arbitrator if the parties could not agree as to how the matter should be resolved (Section 13).  The

time limits of Section 13 were shortened by the CAB in the *Allegheny-Mohawk* case in order to

"expedite" the seniority integration process.  *Allegheny-Mohawk*, 59 CAB at 32-33

("disagreement over the issues involved or over the selection of the arbitrator can prolong

disputes needlessly, to the detriment of the employees").  *See American-Trans Caribbean*

---

[8]  One of these five, the Transport Workers Union of America, limited its position to the craft or class of Dispatchers.  Exhibit 14.

[9]  For the information of the Court, Sections 3 and 13 are included as Exhibit 17.  After several years of case-by-case evolution, the LPPs imposed by the CAB in the Allegheny-Mohawk merger became "standard" in such proceedings from that time forward until the CAB was phased out of existence by the Airline Deregulation Act of 1978.  *Allegheny-Mohawk*, 59 CAB 19, 32-33 (1972); *North Central-Southern Merger Case*, 82 CAB 1, 24, 31 (1979).  The Department of Transportation ("DOT") succeeded to CAB authority to impose and enforce LPPs.  In its final years, the CAB urged carriers and unions to address the subject matter of LPPs in collective bargaining, *National Airlines Acquisition*, 97 CAB 592 (1982), and DOT later announced that it would not impose labor protective provisions as a matter of course, deferring such issues to collective bargaining.  *NWA-Republic Acquisition Case*, 1986 WL 70258 (D.O.T. 1986); *TWA-Ozark Acquisition Case*, 1986 WL 69997 (D.O.T. 1986).

*Merger Case*, 57 CAB 581 (1971), *aff'd American Airlines, Inc. v. CAB*, 445 F.2d 891 (2d Cir. 1971).[10]

Following deregulation and the subsequent demise of the CAB, several major air carriers and unions incorporated some or all of the Allegheny-Mohawk LPPs in their collective bargaining agreements; AFA's most recent collective bargaining agreement with Northwest incorporates, *inter alia*, Sections 3 and 13.  Exhibit 18.[11]

In December 2007, Congress enacted a special law addressing seniority integration in airline mergers, the so-called "McCaskill-Bond" legislation, Public Law 110-161, Div. K, Title I, § 117 (effective Dec. 26, 2007) (copy enclosed at Exhibit 20).  This statute incorporates by reference Sections 3 and 13 of the Allegheny-Mohawk LPPs and directs that airlines use those provisions to address seniority integration issues in airline mergers with respect to crafts or classes where the same union did not represent the same craft or class of pre-merger employees at the combining carriers.  There is little legislative history to this new law.[12]  There is, however,

---

[10]  In addition, the CAB repeatedly rejected attempts to litigate various issues arising under Sections 3 and 13 prior to the conclusion of the process, deferring all issues to the arbitrator in the first instance.  "We have held that the labor protective provisions 'are intended as a system of self-government' between merging carriers and affected employees (or their representatives) and that the arbitration requirement in the provisions is intended to be 'the means of solving the unforeseeable [dispute]…' without Board intervention."  *National Airlines Acquisition*, 97 CAB 570, 573 (1982); *see also Tiger-Seaboard Acquisition*, 101 CAB 659, 662 (1983) ("We . . . resolve '[a]ll doubts regarding arbitrability' in favor of coverage," *quoting Pan Am. World Airways, Inc. v. CAB*, 683 F.2d 554, 559 (D.C. Cir. 1982).

[11]  Indeed, even prior to the new statute relating to seniority integration in airline mergers, Delta had publicly committed to its non-union employees that, in the event of any future merger involving Delta, in those job groups where seniority determines job rights, any integration of seniority would be conducted in a "fair and equitable" manner in accord with Sections 3 and 13 of the Allegheny-Mohawk LPPs.  Exhibit 19.

[12]  The websites of Senators Bond (R-Missouri) and McCaskill (D-Missouri) attribute the impetus for this law to the alleged mistreatment of the seniority rights of employees of TWA when TWA was acquired by American Airlines in 2001.  (Senators Bond and McCaskill represent the State of Missouri, where TWA was headquartered at the time of its acquisition by

(continued...)

substantial CAB and judicial precedent[13] that elaborates upon the meaning of Sections 3 and 13

of the Allegheny-Mohawk LPPs.  That precedent includes cases that address the application of

those provisions where the same union did not represent the same craft or class of pre-merger

employees at the combining carriers.  *See*, *e.g.*, *Delta Air Lines, Inc. v. CAB*, 574 F.2d 546 (D.C.

Cir. 1978) and 63 CAB 700 (September 11, 1973).

---

(...continued)

American.)  The incumbent unions at American decided to place substantially all of the TWA
employees effectively at the bottom of the combined seniority list.  As a result, a TWA flight
attendant with many years of seniority became junior to a first-year American flight attendant for
purposes including order of furlough in the event of a workforce reduction.  *See*
http://mccaskill.senate.gov/newsroom/record.cfm?id=274473& (last visited 12/15/08):
"McCaskill introduced the amendment in response to the hardships faced by former TWA flight
attendants who were laid off after 9/11, when hundreds were furloughed as a result of seniority
they lost when TWA was acquired by American Airlines.  The McCaskill amendment would
protect employees from similar situations in the future" and
http://bond.senate.gov/public/index.cfm?FuseAction=PressRoom.NewsReleases&ContentRecor
d_id=EA553F5B-0A8F-D0FA-1F67-C3037657D818 (last visited 12/15/08): "U.S. Senators
Claire McCaskill and Kit Bond today secured a provision to the Senate's omnibus spending bill
to provide air carrier employees with a base level of protection during mergers.  With 1,253
former TWA employees still at risk of losing recall rights five years after being laid off from
TWA's merger with American, McCaskill and Bond are seeking to prevent similar scenarios
from occurring in the future.  The provision would ensure a merger process by which airline
employee seniority lists can be integrated in a fair manner.  If a dispute occurs, the parties can
engage in binding arbitration.  This provision would make it harder for one airline or union to
add the employees of another airline or union to the bottom of the seniority list.  Thousands of
former TWA flight attendants lost their seniority after American Airlines acquired TWA and
were furloughed after September 11.  This provision would help prevent such occurrences in the
future . . .  'This provision is an important piece of the puzzle to ensure workers in the future
don't suffer the same fate as the TWA workers.  I'm also hopeful it will aid in negotiations
towards a final settlement for those workers,' McCaskill said  'Our TWA workers were given
promises and only got pink slips, this provision is a critical step in protecting airline workers
from this fate in the future,' said Bond.  'It was a pleasure to work with Senator McCaskill to
secure these protections.'" (emphasis added).

[13] *See*, *e.g.*, *U.S. v. White*, 116 F.3d 948, 950 (1st Cir. 1997) (where Congress expressly
acknowledged close relationship between old and new legal doctrines, courts will construe the
two statutes *in pari passu*, and "case law under [the older statute] is persuasive in construing [the
new statute], and vice versa.").

In the Fall of 2008, when the closing of the merger with Northwest became imminent, Delta began preparing to comply with the requirements of Sections 3 and 13.  In accordance with CAB precedent on the application of Section 3 where the same union did not represent both groups in a craft or class at the combining carriers, Delta invited pre-merger Delta employees in various workgroups to designate a Merger Committee to act on their behalf.[14]  Delta also invited AFA, AMFA and the IAM (pre-merger union representatives of Northwest employees) each to designate a Merger Committee to interact with their counterparts from the Delta side of the merger pursuant to Sections 3 and 13.  Exhibits 22-24.  The CAB had approved of the creation of such Merger Committees for purposes of Sections 3 and 13.  *Delta Air Lines, Inc. v. CAB*, 574 F.2d 546, and 63 CAB 700.  One of Northwest's unions, the TWU (dispatchers), initiated such efforts with its counterpart at Delta, PAFCA, and one Northwest union, AMFA (mechanics), agreed to create Merger Committees to interact with their counterparts on the Delta side of the merger, where the mechanics are non-union.  AFA refused to participate in such a process and initiated this litigation seeking a determination that Delta is prohibited from proceeding in this manner.  Exhibit 2.

**IV.    THE AMENDED COMPLAINT PRESENTS A REPRESENTATION DISPUTE THAT IS BEYOND THE JURISDICTION OF THIS COURT AND WITHIN THE EXCLUSIVE JURISDICTION OF THE NMB**

**A.    The NMB Has Exclusive Jurisdiction Over Union Representation Issues Arising In Airline Mergers.**

In *Switchmen's Union*, the Supreme Court held (a) that the Railway Labor Act creates a comprehensive scheme for resolution of all types of labor disputes in the railroad and airline

---

[14]  At the time they negotiated their Joint Collective Bargaining Agreement with Delta in the Spring and Summer of 2008, the ALPA-represented pilots from both Northwest and Delta had agreed to similar procedures for the integration of the pilot seniority lists.  Exhibit 21.

industries, with exceptionally limited court involvement; and (b) that the National Mediation

Board has *exclusive* jurisdiction over all aspects of representation disputes, and that the courts

have none.  The *Switchmen's* case presented the question, present in all mergers, whether two

carriers in the same corporate family have combined sufficiently to become a "single carrier" or

"single transportation system" for representation purposes.  The Supreme Court held, however,

that when this question arises, it lies exclusively within the NMB's mandatory jurisdiction, and,

therefore, lies beyond the subject matter jurisdiction of the federal courts:

> The Act in § 2, Fourth writes into law the "right" of the "majority of any craft or class of employees" to "determine who shall be the representative of the craft or class for the purposes of this Act." That "right" is protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held . . . .  A review by the federal district courts of the Board's determination is not necessary to preserve or protect that "right."  Congress for reasons of its own decided upon the method for the protection of the "right" which it created.  It selected the precise machinery and fashioned the tool which it deemed suited to that end.  Whether the imposition of judicial review on top of the Mediation Board's administrative determination would strengthen that protection is a considerable question.  All constitutional questions aside, it is for Congress to determine how the rights which it creates shall be enforced. . . .  In such a case the specification of one remedy normally excludes another.

320 U.S. at 300-01 (footnote omitted).[15]  Because Congress's "intent [to vest the NMB with

exclusive jurisdiction in the area] seems plain . . . [t]here [is] to be no dragging out of the

controversy into other tribunals of law."  *Id.* at 305.

---

[15]  The Supreme Court made similar statements in two other RLA cases decided the same day. *Gen. Comm. of Adjustment v. Missouri-Kansas-Texas R.R. Co.*, 320 U.S. 323, 336, 338 (1943) (Congress "fashioned an administrative remedy and left that group of [representation] disputes to the National Mediation Board," and "Any decision on the merits would involve the granting of judicial remedies which Congress chose not to confer."); *Gen. Comm. of Adjustment v. Southern*

(continued...)

The D.C. Circuit has had occasion to consider *Switchmen's Union* on a number of occasions.[16]  In *AFA v. Delta Air Lines, Inc.*, 879 F.2d at 912 (emphasis added), for example, the court observed that:

> All of the courts of appeals to have considered the issue (as this court has not) have held *that the question whether a union's certification survives an airline merger is a matter within the exclusive jurisdiction of the NMB* . . . .  The result is no different if the union frames its action as a contract dispute arising from a successorship clause in a collective bargaining agreement.  A claim seeking either specific performance of such a clause or a declaration that it is binding is non-justiciable because the relief sought is, in effect, a certification within the meaning of §2, Ninth; and as such, it is within the exclusive competence of the NMB.

---

(...continued)

*Pacific Co.*, 320 U.S. 338, 343 (1943) (action for declaratory judgment on validity of a collective bargaining agreement constitutes representation dispute within exclusive jurisdiction of NMB because it "raise[d] the question whether one collective bargaining agent or the other is the proper representative for the presentation of certain claims to the employer.").  *Accord, Bhd. of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Employees*, 380 U.S. 650, 662 (1965) (noting "the experience of the [National Mediation] Board through the years" and confirming that NMB decisions on representation were within the special competence of the NMB and, therefore, not subject to judicial review).

[16]  The D.C. Circuit's position on this issue is consistent with decisions from the other circuits: *FEIA v. Pan Am. World Airways, Inc.*, 896 F.2d 672; *IUFA v. Pan Am. World Airways, Inc.*, 836 F.2d 130; *ALEA v. Republic Airlines, Inc.*, 798 F.2d 967; *IBT v. Texas Int'l Airlines, Inc.*, 717 F.2d 157; *IAM v. Northeast Airlines, Inc.*, 536 F.2d 975; *Bhd. of Ry. and S.S. Clerks v. United Air Lines, Inc.*, 325 F.2d 576 ("Looking through form to substance . . . although the suit is cast in the form of an action under the law of contracts, it in fact involves a representation dispute. Even though an action is brought as one sounding in contract the courts have no jurisdiction 'where 'validity' of the contract depends upon the merits of a representation dispute.'"); *Division No. 14, Order of R.R. Telegraphers v. Leighty*, 298 F.2d at 20.  Only the Ninth Circuit has disagreed with this weight of authority, and its decision was promptly stayed by Justice O'Connor, acting as Circuit Justice, and later vacated.  *Teamsters Local 2707 v. Western Airlines, Inc.*, 813 F.2d 1359 (9th Cir. March 31, 1987), *stayed*, 480 U.S. 1301 (April 2, 1987) (O'Connor, J.), 484 U.S. 806 (Oct. 5, 1987) (vacated; remanded to Ninth Circuit for consideration of mootness), 854 F.2d 1178 (9th Cir. 1988) (dismissed as moot).

*See also IBT v. Texas Int'l Airlines*, 717 F.2d at 162 ("The form of the complaint [does] not control, for the substance of the dispute in fact involve[s] the question of representation of the employees.").

Similarly, in *AFA v. United Airlines, Inc.*, 71 F.3d 915, 918 (D.C. Cir. 1995), the court observed that "it [was] rather obvious that if two airlines merge and their employees in the same jobs are represented by different unions the federal courts lack jurisdiction over collective bargaining claims because a representation question is necessarily implicated."

**B.  The "Single Carrier" Issue Raised By The Amended Complaint Is A Representation Issue Within The Exclusive Jurisdiction Of The NMB.**

As these authorities make clear, there can be no doubt that the NMB has exclusive jurisdiction to consider whether two carriers have become sufficiently integrated to become a "single carrier" for representation purposes under the RLA.  As noted above, the Supreme Court's seminal *Switchmen's Union* case held as much in a "single carrier" case arising out of the consolidation of various railroads under common ownership.  And, in *May v. Shuttle, Inc.*, 129 F.3d at 175, the D.C. Circuit cited *Switchmen's Union* and concluded that "the Court does not have jurisdiction to review the single carrier determination."  *Id.*

Similarly, in *Air Line Pilots Ass'n v. Texas Int'l Airlines*, 656 F.2d 16, 19 (2d Cir. 1981), the union alleged carrier interference with the union's asserted representational rights following a corporate transaction.  The district court dismissed for want of jurisdiction and the Second Circuit affirmed:  "any attempt by the union of the pre-existing carrier to force recognition by the new corporation would raise a representation dispute under § 2, Ninth, and would be within the exclusive jurisdiction of the NMB" because only the NMB could determine if the two were a "single carrier."  It did not matter that no party had yet invoked the NMB's services to address that representation issue.  The Second Circuit reached similar results when "single carrier" issues

were presented in *IUFA v. Pan American World Airways, Inc.*, 836 F.2d 130, and *FEIA v. Pan Am. World Airways, Inc.*, 896 F.2d 672 (same).  Likewise within the Board's exclusive jurisdiction are the contested issues that are the predicate of each count of the Amended Complaint here:  whether Delta and Northwest remain separate carriers and whether, under the RLA, AFA may continue to represent former Northwest flight attendants unless and until it files its own petition for a Board determination of whether Delta is now a single carrier under the merger.  *See supra* at III.C.

      **C.**     **The Addition Of "Interference" Claims Does Not Create Jurisdiction Over Representation Issues.**

      The Amended Complaint (¶¶ 25, 30) seeks a Declaratory Judgment that "Delta's efforts to initiate the seniority integration process . . . prior to an NMB finding that a single carrier exists and a representation election" violate the commands of Sections 2, Third and Fourth, of the RLA against carrier interference with employees' free choice of union representation.  AFA cannot manufacture jurisdiction by including such a claim, however.  In another merger case, *ALEA v. Republic Airlines, Inc.*, 798 F.2d 967, the union included similar "interference" charges, but the Seventh Circuit found that the NMB had exclusive jurisdiction over all of the claims asserted, including the interference claims, based on "the overwhelming and well-developed case law addressing issues similar to those presented in the instant complaint."  *Id.* at 968.  Similarly, in *Texidor v. Ceresa*, 590 F.2d 357 (1st Cir. 1978), the employer negotiated a new collective bargaining agreement with its incumbent union during an election campaign instigated by an insurgent union.  The insurgent union sued the employer alleging that the employer had unlawfully interfered with employee free choice in violation of the RLA.  The First Circuit held,

however, that those issues in such circumstances are for the NMB to decide.[17]  *Accord Air Line Pilots Ass'n v. Texas Int'l Airlines*, 656 F.2d at 19; *AMFA v. United Airlines, Inc.*, 406 F. Supp. 492 (N.D. Cal. 1976).

Paragraph 29 of the Amended Complaint expressly links the alleged "unlawful interference" claims with AFA's status as a union representative, and Paragraph 30 expressly links the same claim to the unrepresented status of the Delta flight attendants.  The use of "interference" language, however, cannot create subject matter jurisdiction where the nature of the dispute reveals that genuine representation issues are at its heart.  In such circumstances, the courts must defer to the NMB.

The Amended Complaint adds very little to the original Complaint, but does crystallize new allegations (new paragraphs 20, 26, and 31), which were arguably implicit in the original Complaint asserting that Delta has formed a "Company union."[18]  Specifically, the Amended Complaint alleges that Delta has violated Section 2, Third and Fourth of the RLA by facilitating the creation of a Merger Committee to address seniority integration issues (only) on behalf of the pre-merger Delta flight attendants.   In the circumstances of this case, where there is a bona fide representation dispute about post-merger representation, these "Company union" arguments

---

[17]  The NMB has a substantial body of case law addressing allegations of carrier or union misconduct during the pendency of representation disputes, including such remedies as re-run elections and/or use of different balloting procedures.  *See Laker Airways*, 8 NMB 236 (1981) (carrier misconduct resulted in use of special ballot for re-run election); *Key Airlines*, 13 NMB 153 (1986) (same); *Stillwater Central R.R.*, 33 NMB 100 (2006) (re-run election ordered after finding of carrier interference).

[18] AFA also withdrew language in what are now Paragraphs 29 and 30 of the Amended Complaint (Paragraphs 27 and 28 of the Original Complaint) which had described their role as protective of the interests of the former Northwest flight attendants, and substituted language which is apparently intended to adopt more of a bipartisan tone as between the two flight attendant groups.  Delta believes that those changes do not affect the legal sufficiency of the complaint.

remain outside the Court's jurisdiction.  AFA made *precisely* the same argument before the

NMB in 2001, when AFA tried but failed to win an election at Delta.  The NMB proved itself

capable of addressing those issues in the context of its exclusive jurisdiction over representation

disputes.[19]

### D.     The Addition Of Claims Under The New Seniority Integration Law Does Not Lead To A Different Result.

Having litigated these issues repeatedly, AFA understands that this Court has no

authority to impinge on the NMB's mandatory and exclusive jurisdiction over representation

disputes.  Thus, AFA has re-characterized the lawsuit in less straightforward terms, in this

instance by adding to the Amended Complaint a set of allegations, in Count III (¶¶ 32-37),

premised on the recent statute regarding seniority integration.  AFA proceeds, however, to allege

(¶ 35) that the new statute must be "[r]ead together and in harmony with the RLA" and must

"contemplate that . . . seniority integration [] will not occur until after" the NMB has made a

single carrier finding and held a representation election.  AFA further alleges (¶ 36) that, under

the new statute, "the method by which seniority integration is accomplished is dependent upon

the outcome of a representation election."  Thus, AFA's claims under the new statute are also

"inextricably intertwined" with representation issues that the Court has no authority to address.

While the statute relating to seniority integration is new, the underlying issues relating to

seniority integration in mergers are not.  In *IAM v. Northeast Airlines, Inc.*, 536 F.2d 975, a

union sought to compel bargaining about seniority integration and contract issues following the

merger of Northeast into Delta and seniority integration proceedings conducted pursuant to the

---

[19] Moreover, Delta's efforts to facilitate the efforts of its employees to select representation for the seniority integration process was precisely what Congress *required* when it adopted he former Allegheny-Mohawk procedures, which contemplate the creation of Merger Committees to represent non-union employees for seniority integration purposes.  *See* 63 CAB 700 (1973).

Allegheny-Mohawk LPPs.  The First Circuit concluded that the courts were without jurisdiction to hear the complaint, however, because "the duty to bargain imposed by the [RLA] is a duty to bargain with the chosen representative of the majority of a craft or class . . .  At the very least, the merger created real doubts about whether plaintiffs represent the majority of any Delta craft . . . and where there is such doubt, federal courts leave resolution of the dispute to the [NMB]."  *Id.* at 976-77.  "Allowing the union, which had represented certain employees before the merger, to participate in discussing integration of seniority lists would seem not to involve an onerous burden, although the CAB, under whose Labor Protective Provisions the integration occurred, has held that such a union need not automatically be recognized as the employees' representative for Labor Protective Provision purposes. …However, the real question is not whether it would have been a good idea for Delta to discuss the integration of seniority lists with plaintiffs, but whether the district court had jurisdiction to decide that it should have done so."  *Id.*

Similarly, in *Division No. 14, Order of R.R. Telegraphers v. Leighty*, 298 F.2d at 19, the Fourth Circuit held that a district court had no jurisdiction over a union effort to enjoin another union and the surviving carrier from implementing an agreement between them regarding integration of seniority rights:  "in representation disputes, the adjudicatory function has been committed by Congress to the [NMB]."

**E.    The Addition Of An Individual Plaintiff Does Not Lead To A Different Result.**

AFA has attempted to evade these well-worn legal principles by adding an individual plaintiff.  Jurisdiction cannot be created, or evasion accomplished, so easily.  If it were this simple, any union seeking to avoid the NMB's jurisdiction could easily adopt such an expedient. It is not the name of the plaintiff that gives rise to the jurisdictional impediment presented by the

present Amended Complaint — it is the nature of the relief sought.  Plaintiff Bicksler's claims

are identical to those AFA presents.  As with AFA, Plaintiff Bicksler's remedy lies before the

NMB.

**V.      THE COURT HAS NO SUBJECT MATTER JURISDICTION OVER CLAIMS
ARISING UNDER THE MCCASKILL-BOND STATUTE REQUIRING
ARBITRATION OF SENIORITY INTEGRATION ISSUES**

    **A.      The McCaskill-Bond Statute Creates No Private Right Of Action.**

When considering the legislation that became the McCaskill-Bond statute, Congress

considered — but rejected — an earlier version that included a provision which would have

recognized a private right of action for unions or employees impacted by alleged violations of

the new law.  In its original form, the legislation included a private right of action in favor of

"[a]ny aggrieved person (including any labor organization that represents [such a] person) . . . to

enforce" the bill's substantive provisions.[20]  Before passing the bill, however, Congress struck

that provision, leaving the legislation without any private right of action and remitting any such

"aggrieved person" to the arbitration mechanism created by Section 13 of the Allegheny-

Mohawk Labor Protective Provisions, which the legislation incorporates by reference.  As the

Supreme Court has said, when Congress deletes language from successive versions of the same

bill, a reviewing court must assume that the deletion was intentional, and the deleted provision

should not be lightly read back into the law by a reviewing court.  *Russello v. U.S.*, 464 U.S. 16,

23-24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but

deletes it prior to enactment, it may be presumed that the limitation was not intended."); *see also*

*In re Century Cleaning Servs., Inc.*, 195 F.3d 1053, 1062 (9th Cir. 1999) (when Congress deleted

---

[20]  See Exhibit 25, S. 1479 (Oct. 1, 2001).

language "from the legislation . . . after it was introduced [the court] should infer as a matter of

statutory construction that Congress intentionally rejected" earlier version.)

    **B.**    **Jurisdiction Over Disputes Under The Allegheny-Mohawk Labor Protective Provisions Rests Exclusively In Arbitration.**

    Long-standing case law under the Allegheny-Mohawk LPPs, including controlling

authority from the D.C. Circuit, confirms that disputes regarding seniority integration were to be

resolved in a single arbitration proceeding, not in court. *See Airline Pilots Ass'n Int'l v. Dep't of

Transp.*, 880 F.2d 491, 499 (D.C. Cir. 1989) ("the Federal Aviation Act grant[s] the [arbitrator,

and then the CAB] *exclusive* jurisdiction over '. . . the fair and equitable integration of seniority

lists . . . subject only to review in the courts of appeals.'") (emphasis added); *National Airlines

Acquisition*, 97 CAB 570 (1982); *Tiger-Seaboard Acquisition*, 101 CAB 659 (1983).[21]  Indeed,

the CAB (and later the DOT as successor to CAB) repeatedly emphasized the need for

expeditious resolution of LPP issues and stated that it would not entertain piecemeal review of

issues arising under LPPs, but would defer all such matters to the arbitrator.  *Id.*[22]  Section 13 of

---

[21]  When the CAB (or later, the DOT) imposed LPPs, review of arbitration decisions was, in the first instance, for the CAB (or DOT), which repeatedly stressed that it would not review the merits of matters subject to arbitration under the LPPs absent a showing of "bad faith, or deliberate attempt to subvert the Board's Order, or other compelling circumstances." *National Airlines Acquisition*, 97 CAB 592 (1982), Order 82-8-110, quoting *Delta-C&S Seniority List*, 29 CAB 1347, 1349 (1959), *affirmed sub nom. Outland v. CAB*, 284 F.2d 224 (D.C. Cir. 1960).  A final decision of the CAB was subject to further review in the Circuit Courts of Appeals, but challenges to CAB decisions affirming LPP arbitration decisions were both rare and uniformly unsuccessful.  *See National Acquisition*, 97 CAB 565, 568 (1982); *Pan Am. World Airways v. CAB*, 683 F.2d 554, 562 (D.C. Cir.1982).

[22]  *See also Tiger Int'l-Seaboard World Airlines*, 1991 WL 284505, at *4 (D.O.T. 1991) ("the LPP section on resolving disputed claims (section 13) indicates that claims should be resolved promptly, *e.g.*, by authorizing arbitration if the parties cannot resolve a dispute within twenty days and by requiring the arbitrator to issue a decision within ninety days after the dispute began. As a result, the [CAB] held that claims . . . must be submitted within a reasonable time. . . .  We have consistently followed [the CAB]'s interpretation of the LPPs."); *Delta-Northeast Merger Case*, 71 CAB 1699 (1976).

the Allegheny-Mohawk LPPs is the stand-alone arbitration mechanism Congress intended to be the primary means of enforcing the LPPs.  By adopting Sections 3 and 13 of the Allegheny-Mohawk, Congress necessarily understood that it was adopting the exclusive arbitration regime that prevailed under those LLPs for many years.  *See*, *e.g.*, *Florida Power & Light Co. v. U.S.*, 846 F.2d 765, 778 (D.C. Cir. 1988) ("Congress was not writing on a blank slate.  It was legislating against the backdrop of a well-established body of judicial decisions . . . .  Congress can reasonably be assumed to have adopted at least some of the gloss placed on those terms through the decisional law."); *see also U.S. v. White*, 116 F.3d at 950 (where Congress expressly acknowledged close relationship between old and new legal doctrines, courts will construe the two statutes in *pari passu*, and "case law under [the older statute] is persuasive in construing [the new statute], and vice versa."); *cf. Gonzales v. Garner Food Services, Inc.*, 89 F.3d 1523, 1532-33 (11th Cir. 1996) (Congress necessarily understood that by using same definition of word in one statute that had been used in another, prior statute, courts would look to case law under latter in interpreting former).

### C.     If The Court Were To Interpret McCaskill-Bond As Plaintiffs Suggest, The Statute Would Not Accomplish Its Stated Purpose.

By imposing Sections 3 and 13 of the Allegheny-Mohawk LPPs, the McCaskill-Bond statute imposes a prompt, efficient, and fair process for resolving disputes over how seniority lists should be integrated in an airline merger.  When the *same* union represented the *same* craft or class of affected employees (pre-merger) at both merger partners, the legislation recognizes; the union's internal seniority policies will typically resolve the matter.[23]

---

[23]   AFA relies entirely on this "exception" in arguing that the McCaskill-Bond process must wait a single carrier determination and an election, but that position cannot be reconciled with the language of the statute.  The exception only applies "if the same [union] represents the *combining* crafts or classes at *each of the covered air carriers*."  Congress carefully referred to

(continued...)

Mischief can arise, however, when different unions represented the pre-merger employees at the two companies, as was the case of American-TWA, or if (as here) one group is union-represented and the other is not.  In that circumstance, Congress *might* have chosen to leave the parties in limbo, and the seniority lists separate, until an NMB-directed election could be held to determine which (if any) union would represent all of the employees.

Congress rejected this choice.  It understood that the NMB election process could take some time, and that, under D.C. Circuit precedent, only the union (or an employee with broad support)[24] could initiate it.  A minority union — with little hope of winning an election — would have no incentive to start the process; rather, the union's incentive would be to *forestall* NMB action for as long as possible as it tried to build support.  In the meantime, the airline could not complete the merger of its operations and the employees would be denied the benefits a united seniority list would offer.

AFA's construction of McCaskill-Bond would render the enactment substantially irrelevant.  If, as AFA insists, the process of seniority integration must await an NMB election

---

(...continued)

*combining* crafts or classes, not *combined*, and covered *carriers*, not the one carrier that survives the merger.  The phrase "covered air carrier" is a defined term in the statute; it applies to the two pre-merger carriers, not to the surviving carrier.  Thus, the exception clause can only refer to the representational status of the two *pre-merger* entities.  Indeed, if it were read as AFA insists, the legislation would be incapable of fixing the problem it was intended to fix; as explained in the text, by the time the single carrier determination is made and an election held, all of the employees would either be non-union or the same union would represent all of the employees, making a seniority integration statute substantially irrelevant.  *See*, *e.g. Chemical Mfrs. Ass'n v. NRDC*, 470 U.S. 116, 125-26 (1985) (where an asserted "plain" reading of statutory language would lead to absurd results, language has no plain meaning).

[24]  While the NMB will accept an application for investigation of a representation dispute from an individual employee, it typically will dismiss such an application if it is not accompanied by a "showing of interest" such as authorization cards, from at least 35% of the employees in the craft or class.  NMB Representation Manual at § 19.602-19.603.

and an NMB election must wait until AFA wishes to seek one, the statute's promise of expeditious, fair resolution of seniority integration problems would be hollow. *See Allegheny-Mohawk*, 59 CAB at 32-33 (seniority integration intended to proceed expeditiously).

## VI.      CONCLUSION

For all of the foregoing reasons, Delta respectfully submits that the Court must dismiss the Amended Complaint for lack of subject matter jurisdiction.

December 15, 2008                          Respectfully submitted,


By:_____/s/ John J. Gallagher_____
      John J. Gallagher (D.C. Bar # 191502)
      Neal D. Mollen (D.C. Bar # 413842)
      Margaret H. Spurlin (D.C. Bar # 296970)
      PAUL, HASTINGS, JANOFSKY & WALKER LLP
      875 15th St., N.W.
      Washington, D.C.  20005
      (202) 551-1700

      Attorneys for Delta Air Lines, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties registered with the CM/ECF system:

Robert S. Clayman, Esq.
Carmen R. Parcelli, Esq.
GUERRIERI, EDMOND, CLAYMAN & BARTOS, P.C.
1625 Massachusetts Avenue, NW
Suite 700
Washington, DC 20036-2243
(202) 624-7400
(202) 624-7420 (fax)
rclayman@geclaw.com
cparcelli@geclaw.com

Attorneys for Association of Flight Attendants-CWA and
Marianne Bicksler


        /s/ John J. Gallagher
Attorney for Delta Air Lines, Inc.